UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

- - - - - - - - - - - - - - - - - -:
JOSEPH NELSON,                          :      16 Civ. 3530 (JCF)
                                        :
                Plaintiff,              :      MEMORANDUM
                                        :      AND  ORDER
    - against -                         :
                                        :
CAROLYN W. COLVIN, Acting               :
Commissioner of Social Security,        :

                Defendant.              :
- - - - - - - - - - - - - - - - - -:

JAMES C. FRANCIS IV
UNITED STATES MAGISTRATE JUDGE

USDS SDNY
DOCUMENT
ELECTRONICALLY FILED
DOC #: _____
DATE FILED: 4/14/17

The plaintiff, Joseph Nelson, brings this action pursuant to section 205(g) of the Social Security Act (the "Act"), 42 U.S.C. § 405(g), seeking review of a determination of the Commissioner of Social Security (the "Commissioner") finding that he is not entitled to disability insurance benefits ("DIB"). Both parties have moved for judgment on the pleadings pursuant to Rule 12(c) of the Federal Rules of Civil Procedure. For the reasons that follow, the plaintiff's motion is denied and the Commissioner's motion is granted.[1]

Background

    A.    Procedural History

Mr. Nelson applied for a period of disability and DIB on April

---

[1] The parties have consented to my jurisdiction for all purposes pursuant to 28 U.S.C. § 636(c).

1

23, 2012, alleging disability as of April 18, 2011. (R. at 17).[2]
After his claim was denied on initial review (R. at 88-92), the
plaintiff requested a hearing before an administrative law judge
("ALJ") (R. at 96). A hearing was held on March 28, 2014, before
ALJ Robert Gonzalez, at which Mr. Nelson was represented by
counsel. (R. at 32-75). On September 16, 2014, the ALJ issued a
determination finding that Mr. Nelson was not entitled to DIB under
the Act. (R. at 17-27). The Appeals Council denied review on
March 18, 2016, rendering the ALJ's decision the final
determination of the Commissioner. (R. at 1-3). The plaintiff
then commenced this action.

B.    Personal History

Mr. Nelson was born in 1956 and has an associate's degree in
microprocessing and telecommunications. (R. at 72, 81). The
plaintiff worked as an auto technician at a car repair business
from 1988 to April 18, 2011, when he was laid off, and he has not
worked since. (R. at 39, 207).

C.    Medical History

Prior to the alleged onset date, Mr. Nelson suffered a work-
related accident in 1977 while employed as an auto mechanic. (R.
at 308). He sustained a skull fracture, contusion of the brain,

---

[2] "R." refers to the administrative record, filed as part of
the Commissioner's answer.

and damage to left eye, left jaw, and teeth, and he had a metal plate placed in his skull. (R. at 308). He returned to work eight years later in a reduced capacity. (R. at 308). Additionally, prior to the initial onset date, Mr. Nelson was hospitalized at the Behavioral Health Unit of Orange Regional Medical Center from April 7, 2010 to April 12, 2010, for depressive disorder and alcohol abuse. (R. at 268-71).

1. Consulting Physicians

    a. Dr. Alan Dubro

After Mr. Nelson filed an application for DIB, Dr. Alan Dubro, Ph.D., conducted a consultative psychiatric evaluation on June 27, 2012. (R. at 272). The plaintiff informed Dr. Dubro about the 1977 injury, stating that it caused intracranial bleeding and a fractured skull. (R. at 272). The plaintiff also reported "what appear[ed] to be" a transient ischemic attack ("TIA")[3] that

---

[3] A TIA is

like a stroke, producing similar symptoms, but usually lasting only a few minutes and causing no permanent damage.

Often called a ministroke, a transient ischemic attack may be a warning. About 1 in 3 people who have a transient ischemic attack will eventually have a stroke, with about half occurring within a year after the transient ischemic attack.

Transient Ischemic Attack (TIA), Mayo Clinic, http://www.mayoclinic.org/diseases-conditions/transient-ischemic

occurred six months prior to the visit, but Mr. Nelson did not receive a medical follow-up immediately after the TIA. (R. at 272-73). During the episode, he experienced numbness in his face, weakness in his right leg, difficulty in processing verbal information, and difficulty expressing himself. (R. at 272-73). In addition to the TIA, Mr. Nelson also reported hypertension, migraine headaches several times per week, numbness and weakness on the right side of the body, difficulty sleeping, and reduced appetite. (R. at 272-73). Associated with these symptoms, the plaintiff stated that he had become markedly depressed. (R. at 273).

During the examination, Mr. Nelson's motor behavior was sluggish and he could not consistently maintain eye contact. (R. at 273). He did not speak spontaneously, questions often needed to be repeated to him, and he spoke slowly. (R. at 273). Although his thought process was coherent and goal directed, he would frequently lose his train of thought, which Mr. Nelson noted started around the time of the TIA. (R. at 273). His affect was blunted and his mood depressed, but his sensorium was clear. (R. at 273-74). He was oriented to person, place, and time. (R. at 274). His insight and judgment were fair. (R. at 274).

---

-attack/basics/definition/con-20021291 (last visited April 11, 2017).

Mr. Nelson's concentration, attention, recent memory, and remote memory were impaired. (R. at 274). Specifically, Dr. Dubro stated:

> With repetition, the claimant performed mental arithmetic (4 + 5, 10 - 6). Even with repetition, the claimant was not able to perform any other arithmetic calculations mentally (30 divided by 5, 25 times 6, 24 divided by 3).
>
> . . . .
>
> The claimant recalled 1 of 3 items after one minute and none of 3 after five minutes. He repeated 3 digits forward and 2 backward.

(R. at 274). Dr. Dubro estimated that the plaintiff fell into a low-average range of cognitive functioning and opined that the plaintiff had difficulty in long-term memory (for instance, he could not remember how many seconds there were in a minute). (R. at 274). He had marked difficulty in being able to remember and follow directions and instructions, and his attention span was markedly impaired. (R. at 274-75). Mr. Nelson regularly lacked the motivation "to get up and out of bed in the morning," had not been consistently motived to maintain hygiene, could not focus on simple chores, no longer drove or traveled on his own, and experienced difficulty managing money. (R. at 274). Dr. Dubro opined that Mr. Nelson would have marked difficulty in learning new tasks, interacting with others, making decisions, or maintaining a schedule. (R. at 275).

Dr. Dubro concluded that the results of the exam were consistent with psychiatric and cognitive problems that would significantly interfere with Mr. Nelson's ability to function on a daily basis. (R. at 275). He diagnosed Mr. Nelson with major depression, a non-specified cognitive disorder, hypertension, left-sided weakness, numbness on his face and left side of his body, and migraine headaches. (R. at 275). He recommended psychiatric treatment, and the prognosis was guarded. (R. at 275).

### b.  Dr. Kautilya Puri

That same day, Dr. Kautilya Puri conducted a consultative neurologic examination of the plaintiff. (R. at 277). Mr. Nelson reiterated information about his 1977 accident. (R. at 277). After the accident, he had numbness in his face, arms, and legs, confusion, trouble speaking, difficulty walking, lightheadedness, loss of balance, and persistent headaches. (R. at 277). He also noted an episode of numbness in his right foot and arm six months prior to the consultation and stated that he had a history of high blood pressure. (R. at 277). Mr. Nelson could do some activities of daily living, including some laundry and shopping, and he would shower, dress, watch television, listen to the radio, and "go[] out." (R. at 277).

Mr. Nelson's vision was 20/25 in the right eye, 20/50 in the left eye, and 20/25 with both eyes as measured using a Snellen

chart at twenty feet. (R. at 278). His gait and station were normal, and he did not use an assistive device. (R. at 278). He was able to get off the chair and exam table without difficulty. (R. at 278). However, he had some mild difficulty tandem walking. (R. at 278).

The plaintiff maintained appropriate eye contact, was oriented to time, person, and place, and he had no delusions. (R. at 278). There was no indication of recent or remote memory impairment, and there was no suggestion of impairment in insight or judgment. (R. at 278). His mood and affect were appropriate. (R. at 278). He appeared in no acute distress, and his speech was normal. (R. at 278).

Dr. Puri noted that the plaintiff was post left craniotomy and had local tenderness in the left orbit region. (R. at 278). There was mild left ptosis. (R. at 278). His pupils were equal and reactive to light and accommodation, and his extraocular movements were intact. (R. at 278). No nystagmus was noted, and he had no L/R field defect. (R. at 278). He had no tremor, and his neck was supple with no bruits. (R. at 278).

Mr. Nelson's hand and finger dexterity was intact, and his grip strength was 5/5 bilaterally. (R. at 278). In his upper extremities, strength was 5/5 in proximal and distal muscles, muscle tone was normal, finger-to-nose testing was normal, rapid

alternating movements were normal, and no muscle atrophy was noted. (R. at 278). In his lower extremities, strength was 5/5 in proximal and distal muscles, muscle tone was normal, heel-to-shin testing was normal, Babinski reflexes were negative, there were no tremors or muscle atrophy, and there was no dysmetria. (R. at 279). Dr. Puri noted a "trace" in deep tendon reflexes. (R. at 279).

Dr. Puri wrote that Mr. Nelson had normal sensation to pain, light touch, and vibration, and normal proprioception. (R. at 279). Dr. Puri diagnosed him with prior traumatic brain injury, chronic headaches, and high blood pressure. (R. at 279). Mr. Nelson's prognosis was fair. (R. at 279). Dr. Puri stated that there were no objective limitations to communication, fine or gross motor activity, gait, and activities of daily living. (R. at 279).

### c.    Dr. L. Hoffman

Dr. L. Hoffman,[4] an agency medical consultant, recorded summary conclusions by evaluating Mr. Nelson's file on September 5, 2012. (R. at 280-83, 290-301). Dr. Hoffman noted moderate limitations in ability to understand and carry out detailed instructions, maintain attention for extended periods, perform an activity with a schedule, sustain an ordinary routine without

---

[4] The ALJ assumed that L. Hoffman is a physician (R. at 21), although the record is not clear. I will make the same assumption.

special supervision, respond appropriately to changes in a work setting, and set realistic goals independently of others. (R. at 280-81). However, Dr. Hoffman noted no significant limitation in ability to remember and carry out simple instructions, work in coordination with others without being distracted, make simple work-related decisions, perform at a consistent pace, interact socially, and be aware of normal hazards. (R. at 280-81). Dr. Hoffman noted some organic mental and affective disorders. (R. at 290). There were moderate restrictions in activities of daily living and moderate difficulties in maintaining concentration, persistence, and pace. (R. at 300). There was mild difficulty in maintaining social functioning. (R. at 300).

### 2. Treating Physician

On February 6, 2013, Mr. Nelson met with his treating physician, Dr. Rocco Russo. (R. at 304-07). The treatment records noted Mr. Nelson's 1977 accident and resulting surgeries. (R. at 304). Mr. Nelson did not appear in acute distress, and he was well developed, alert, and cooperative; he had a normal mood and affect, and he had a normal attention span and concentration. (R. at 306). Dr. Russo noted that the plaintiff had "good control" with his hypertension medication. (R. at 306). Dr. Russo found tenderness in Mr. Russo's right calf and recommended a daily runner's stretch and prescribed Flexeril. (R. at 306). He also

recommended some dietary changes to combat Mr. Nelson's mild hyperlipidemia. (R. at 306-07).

On October 15, 2013, Dr. Russo noted that the plaintiff complained of pounding headaches, nausea, photophobia, irritation, sensation of "floating" dark patches, and pain and muscle cramps in his right side; Mr. Nelson described his pain as a "six" in intensity. (R. at 313-14). He had never started the Flexeril. (R. at 313). While Mr. Nelson complained of double vision, Dr. Russo noted that he wore prism lenses. (R. at 317). Mr. Nelson denied chest pain, fatigue, fainting, shortness of breath, and swelling of the hands or feet. (R. at 317).

Upon examination, Mr. Nelson appeared well developed, well nourished, and in no acute distress. (R. at 317). His head was in normal condition but there was tenderness over the left temporal area. (R. at 317). His eyes and ears appeared normal and intact. (R. at 317). His sensation, reflexes, coordination, strength, and tone were normal, and he was alert, cooperative, had normal mood and affect, and had a normal attention span. (R. at 317). The ball of his right foot was tender. (R. at 317). Dr. Russo found that Mr. Nelson previously had a cardiovascular accident ("CVA"), which had resulted in headaches as well as concentration and memory deficits. (R. at 318). Additionally, Dr. Russo diagnosed him with hypertension and ordered additional medication. (R. at 318).

Mr. Nelson visited Dr. Russo again on February 25, 2014, stating that he felt tired, lethargic, and "Blahh" from the winter weather. (R. at 360). Mr. Nelson stated that he was taking his blood pressure medication sporadically because it made him feel tired the next day. (R. at 360). He also stated that he "would like to get out and start doing other things." (R. at 360). He stated that the Flexeril helped with the muscle spasms. (R. at 360). Dr. Russo noted that Mr. Nelson was not in pain, but Mr. Nelson complained of fatigue. (R. at 363). Mr. Nelson was not depressed nor suffering from anxiety, chest pain, or lightheadedness. (R. at 363). Dr. Russo noted that the plaintiff was in no acute distress and that he was alert and cooperative. (R. at 364). He observed that Mr. Nelson was not adhering to the hypertension mediation as prescribed. (R. at 364).

### 3. Other Physicians

On July 31, 2013, Mr. Nelson was seen by Dr. Avtar Singh at the Neurology Group of Westchester. (R. at 308). Dr. Singh noted the plaintiff's 1977 accident and resulting complications, including a history of severe headaches and numbness. (R. at 308). Mr. Nelson complained of loss of vision, double vision, loss of hearing, difficulty speaking, chronic daily headaches, pain in the face, pain in the neck, difficulty walking, and muscle pain and weakness. (R. at 308). Upon examination, Dr. Singh noted that

there was tenderness over the lateral border of Mr. Nelson's left orbit. (R. at 309). A straight leg-raising test was negative bilaterally, and his neck was normal. (R. at 309). Mr. Nelson could remember two out of three objects after five minutes and could remember "4 of 5 presidents," but he failed a calculations test. (R. at 309). His language and attention were normal. (R. at 309). His pupils were reactive to light and accommodation, and his visual fields were full to confrontation. (R. at 309). His vision was 20/20 in the right eye, and 20/40 in the left. (R. at 309). Mr. Nelson's hearing was intact. (R. at 309).

The plaintiff's motor strength was 5/5 in all muscle groups, but he had difficulty raising his right hand above his head. (R. at 309). His stride and tandem gait were normal. (R. at 309). Mr. Nelson's sensation was normal, but there was subjective paresthesia in his right arm and leg. (R. at 309). His coordination and reflexes were normal. (R. at 309).

Dr. Singh diagnosed Mr. Nelson with headaches, a prior head injury, anxiety, and seizures, but noted that the seizure diagnosis was not definite due to lack of any witnessed history. (R. at 309-10). Dr. Singh ordered a computed tomography and an electroencephalogram ("EEG"). (R. at 310).

At the computed tomography scan on August 12, 2013, Dr. Joseph Racanelli noted nothing remarkable except for mild

encephalomalacia[5] in the left frontal lobe secondary to prior trauma. (R. at 311). At the EEG on August 14, 2013, the examiner at the Orange Regional Medical Center opined that the EEG was "probably normal." (R. at 312). While there was excessive beta activity, it was "probably suggestive of underlying anxiety or drug effects," and while there was abnormal activity originating from the F7 electrode, it was "probably artifactual rather than real." (R. at 312). An MRI corroboration and clinical correlation follow-up were recommended. (R. at 312). Mr. Nelson did not follow-up.

### 4. Physical Medical Source Statement

On October 29, 2013, Dr. Russo completed a physical medical source statement. (R. at 319-30). He noted that Mr. Nelson had suffered a CVA and had right side hemiplegia.[6] (R. at 319). He also noted that the plaintiff had hypertension, a traumatic brain injury, and left visual field impairment. (R. at 319). Mr. Nelson's symptoms were decreased stamina, fatigue, frustration, fall risk, and decreased balance. (R. at 319). He noted significant tenderness in the temporal area. (R. at 319).

---

[5] Encephalomalacia is "[a]bnormal softness of the cerebral parenchyma often due to ischemia or infarction." Stedman's Medical Dictionary 587 (27th ed. 2000).

[6] Hemiplegia means "[p]aralysis of one side of the body." Stedman's Medical Dictionary 800 (27th ed. 2000).

He opined that Mr. Nelson would perform poorly in a work environment and that he could only walk a quarter to half a city block without rest or severe pain. (R. at 319). He stated that Mr. Nelson could not sit for more than fifteen minutes without needing to stand up, and that he could stand for forty-five minutes to an hour without needing to sit or walk around. (R. at 320). Mr. Nelson could sit for a total of two hours a day and could stand or walk for two to four hours per day. (R. at 320). Dr. Russo opined that he would have to change position frequently due to numbness and muscle spasms, noting that he would have to walk for ten to fifteen minutes every ten to fifteen minutes. (R. at 320). Mr. Nelson would have to take unscheduled breaks every forty-five minutes for fifteen minutes due to muscle weakness, chronic fatigue, pain, paresthesias, and numbness. (R. at 320-21). Dr. Russo noted no need for an assistive device. (R. at 321). Mr. Nelson could never lift weight with his right hand but could occasionally lift ten pounds with his left. (R. at 321-22). He could occasionally twist and stoop, but could only rarely crouch or squat. (R. at 322). He had significant limitations with reaching, handling, and fingering with his right hand. (R. at 322). With his right hand, he could not grasp, turn, or twist objects; perform fine manipulations with his fingers; reach in front of his body; or reach overhead. (R. at 322). However, he

could perform all of those functions with his left hand and arm. (R. at 322).

Dr. Russo wrote that these symptoms would not interfere with attention and concentration, but multiple tasks and a hectic work environment could case stress reactions. (R. at 322-23). Dr. Russo explained that these conclusions were based on Mr. Nelson's prior traumatic brain injury and the CVA. (R. at 323). Dr. Russo stated that Mr. Nelson would be absent from work more than four days per month. (R. at 323).

### 5. Work Activities Medical Source Statement

Dr. Russo also completed a medical source statement of ability to do work-related activities. (R. at 324). He noted that Mr. Nelson could not lift or carry more than ten pounds for one-third of a workday, and he could do so only with his left arm. (R. at 324). He could sit for two to four hours, stand for forty-five minutes, and walk for two to four hours, but he could only do those things with a break and change in position every fifteen minutes. (R. at 325). This was recommended to avoid muscle spasms and because Mr. Nelson was easily fatigued. (R. at 325). He could never reach, handle, finger, feel, push, or pull with his right hand, but could frequently do so with his left hand; Dr. Russo noted that Mr. Nelson's dominant hand was his right hand. (R. at 326). He could never operate foot controls with his right foot.

(R. at 326).  Mr. Nelson could never climb ladders or scaffolds, balance, stoop, and crawl, but he could occasionally climb stairs and ramps, kneel, and crouch.  (R. at 327).  These restrictions were due to his hemiplegia.  (R. at 326).

Dr. Russo also noted a blind spot in Mr. Nelson's left eye. (R. at 327).  He could avoid ordinary hazards, read ordinary print, view a computer screen, but he could not read very small print or determine the differences in the shape and color of small objects. (R. at 327).  Mr. Nelson could never work around unprotected heights, moving mechanical parts, dust, odors, fumes, extreme cold, extreme heat, or vibrations.  (R. at 328).  He also could not operate a motor vehicle.  (R. at 328).  He could occasionally tolerate humidity and wetness.  (R. at 328).  He could work in a quiet or moderately noisy office, but Dr. Russo noted that he would have decreased focus and be easily distracted in the latter environment.  (R. at 328).  The plaintiff could not work in loud or very loud conditions.  (R. at 328).

Dr. Russo opined that Mr. Nelson could shop, ambulate, use standard public transportation, prepare simple meals, care for personal hygiene, and handle files.  (R. at 329).  However, he could not travel without a companion, walk a block at a reasonable pace on rough surfaces, or climb a few steps without a handrail.

(R. at 329).  Dr. Russo noted that the limitations began with the skull fracture and were exacerbated by the CVA.  (R. at 329).

D.    <u>Testimonial and Non-Medical Evidence</u>

Mr. Nelson completed a function report on June 20, 2012.  (R. at 213).  He stated that he rests all day because his "body is numb and weak" and that he has "constant pain, headache, dizziness, [and] trouble seeing."  (R. at 214).  He also stated that he cannot sleep all night, so he instead sleeps "a lot during the day."  (R. at 214).  He tries to go outside every day.  (R. at 216).  However, he tries to go out with someone else, as he has trouble seeing in one eye and falls.  (R. at 216-17).  He cannot always feed himself or shave.  (R. at 215).  Once each day, he makes a peanut butter and jelly sandwich, and others prepare the rest of his meals.  (R. at 215).  He can do laundry, cleaning, repairs, light shopping, and some yard work by himself.  (R. at 216-17).  He does not socialize or do any hobbies because he cannot "handle people" or "be bothered."  (R. at 218).

Mr. Nelson further stated that he has difficulty lifting because his arms are numb.  (R. at 218).  He has headaches and shooting pains in his body.  (R. at 222).  He does not kneel or squat, and he has trouble reaching, using his hands, seeing, and speaking.  (R. at 219).  He experiences "sudden confusion when in pain," and he has trouble remembering things.  (R. at 220-21).  He

17

can follow spoken and written instructions, and does not have trouble getting along with people in authority or at a job. (R. at 220). He stated that he drives. (R. at 217).

At the administrative hearing, he stated that his stroke occurred around April 2012, and he could not see, speak, or move the right side of his body; he did not go to the hospital. (R. at 48, 68-69). After the stroke, he felt anxious and experienced migraines, numbness, difficulty focusing, and restricted use of his right arm. (R. at 42, 48, 62, 64). He stated his eyesight worsened after the incident but has since improved. (R. at 48).

When asked how he "spend[s] [his] days," Mr. Nelson replied that he tries to exercise. (R. at 52). He rides a bike for a mile or more at times (R. at 52), and a few times a week he walks for a couple of hours (R. at 54). He sometimes swims for two to three hours one or twice a week. (R. at 55-56). He does some cooking, shopping, and cleaning. (R. at 59). He visits a friend once a week. (R. at 62). The plaintiff stated that he travels to Canada five to ten times per year to visit family. (R. at 35-36).

Mr. Nelson testified that he was laid off from his job in April 2011 and received Unemployment Compensation. (R. at 39). He continued to look for work as an automotive repair technician. (R. at 44). The plaintiff also testified that Dr. Russo asked him

questions from the medical source statements and that Dr. Russo later filled the form out. (R. at 71-72).

The plaintiff's sister -- Nancy Nelson -- filled out a third-party function report on August 21, 2012. (R. at 228). She stated, "He cannot use one side of his body. He has short term memory loss. He cannot see properly [and] one eye needs an operation. His brain damage keeps him from moving for 3 days in a row." (R. at 228). She further wrote that he has trouble falling asleep and has serious fatigue. (R. at 229). She stated that he goes outside four days per week, but otherwise, he is inside sick for three days. (R. at 231). She also wrote that he is able to drive and can adequately handle money, but no longer has "patience for people [and] it raises his blood pressure." (R. at 231, 233). She stated that his conditions affect his ability to lift, squat, bend, stand, reach, use his hands, walk, kneel, talk, climb stairs, see, remember, complete tasks, concentrate, understand, follow instructions, and get along with others. (R. at 233).

Analytical Framework

A. Determination of Disability

A claimant is disabled under the Act and therefore entitled to disability benefits if he can demonstrate, through medical evidence, that he is unable to "engage in any substantial gainful

activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than [twelve] months." 42 U.S.C. § 423(d)(1)(A); accord Craig v. Commissioner of Social Security, __ F. Supp. 3d __, __, 2016 WL 6885216, at *6 (S.D.N.Y. 2016).  The disability must be of "such severity that he is not only unable to do his previous work but cannot, considering his age, education, and work experience, engage in any other kind of substantial gainful work which exists in the national economy."  42 U.S.C. §§ 423(d)(2)(A).  To obtain DIB, the claimant must have become disabled between the alleged onset date and the date on which he was last insured.  42 U.S.C. §§ 416(i), 423(a); Kohler v. Astrue, 546 F.3d 260, 265 (2d Cir. 2008); Rivera v. Commissioner of Social Security, No. 15 Civ. 8439, 2017 WL 120974, at *5 (S.D.N.Y. Jan. 12, 2017).

To determine whether a claimant is entitled to disability benefits, the Commissioner employs a five-step sequential analysis.  20 C.F.R. § 404.1520(a)(4); Cichocki v. Astrue, 729 F.3d 172, 173 n.1 (2d Cir. 2013).  First, the claimant must demonstrate that he is not currently engaging in substantial gainful activity.  20 C.F.R. § 404.1520(a)(4)(i), (b).  Second, the claimant must prove that he has a severe impairment that significantly limits his physical or mental ability to perform

basic work activities. 20 C.F.R. § 404.1520(a)(4)(ii), (c). Third, if the impairment meets or equals a listing in Appendix 1 of Subpart P of the regulations (the "Listings"), the claimant is automatically considered disabled. 20 C.F.R. § 404.1520(a)(4)(iii), (d); see 20 C.F.R. Part 404, Subpt. P, App. 1. Fourth, if the claimant is unable to make the requisite showing under step three, he must prove that he does not have the residual functional capacity to perform his past work. 20 C.F.R. § 404.1520(a)(4)(iv), (e). Fifth, if the claimant satisfies his burden of proof on the first four steps, the burden shifts to the Commissioner to demonstrate that there is alternative substantial gainful employment in the national economy that the claimant can perform. 20 C.F.R. §§ 404.1520(a)(4)(v), (g); Cichocki, 729 F.3d at 173 n.1; Craig, __ F. Supp. 3d at __, 2016 WL 6885216, at *7.

B.    Judicial Review

"Any individual, after any final decision of the Commissioner of Social Security . . . , may obtain a review of such decision by a civil action commenced . . . in the district court of the United States." 42 U.S.C. § 405(g). The Act provides that the Commissioner's findings "as to any fact, if supported by substantial evidence, shall be conclusive." 42 U.S.C. § 405(g). A court reviewing the Commissioner's decision "may set aside a decision of the Commissioner if it is based on legal error or if

it is not supported by substantial evidence." Geertgens v. Colvin, No. 13 Civ. 5133, 2014 WL 4809944, at *1 (S.D.N.Y. Sept. 24, 2014) (quoting Hahn v. Astrue, No. 08 Civ. 4261, 2009 WL 1490775, at *6 (S.D.N.Y. May 27, 2009)).

Judicial review, therefore, involves two levels of inquiry. First, the court must decide whether the Commissioner applied the correct legal standard. Tejada v. Apfel, 167 F.3d 770, 773 (2d Cir. 1999); Calvello v. Barnhart, No. 05 Civ. 4254, 2008 WL 4452359, at *8 (S.D.N.Y. April 29, 2008). Second, the court must decide whether the ALJ's decision was supported by substantial evidence. Tejada, 167 F.3d at 773; Calvello, 2008 WL 4452359, at *8. "In determining whether substantial evidence exists, a reviewing court must consider the whole record, examining the evidence from both sides, because an analysis of the substantiality of the evidence must also include that which detracts from its weight." Longbardi v. Astrue, No. 07 Civ. 5952, 2009 WL 50140, at *21 (S.D.N.Y. Jan. 7, 2009) (citing Brown v. Apfel, 174 F.3d 59, 62 (2d Cir. 1999), and Williams v. Bowen, 859 F.2d 255, 256 (2d Cir. 1988)). Substantial evidence in this context is "more than a mere scintilla. It means such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." Hahn, 2009 WL 1490775, at *6 (quoting Richardson v. Perales, 402 U.S. 389, 401 (1971)).

C.   Legal Standard

Where, as here, a party moves for judgment on the pleadings pursuant to Rule 12(c) of the Federal Rules of Civil Procedure, that party is entitled to judgment on the pleadings if he establishes that no material facts are in dispute and that he is entitled to judgment as a matter of law.  Burnette v. Carothers, 192 F.3d 52, 56 (2d Cir. 1999); Claudio v. Commissioner of Social Security, No. 15 Civ. 9847, 2017 WL 111741, at *1 (S.D.N.Y. Jan. 11, 2017).

D.   The ALJ's Decision

ALJ Gonzalez analyzed Mr. Nelson's claim pursuant to the five-step sequential evaluation process and concluded that he was not disabled under the Act from the date he filed for benefits through the date of the decision.  (R. at 17).  The ALJ first found that Mr. Nelson was insured through December 31, 2016.  (R. at 19). Next, he found that the plaintiff had not engaged in any substantial gainful activity since April 18, 2011, which was the alleged onset date.  (R. at 19).

At step two, he found that Mr. Nelson had the following severe impairments: headaches and migraines, a possible seizure disorder, anxiety, a cognitive disorder and depression, and subjective right arm paresthesia.  (R. at 19).  These impairments more than minimally affected his ability to perform basic work activities.

23

(R. at 19). However, the ALJ found that Mr. Nelson's hypertension, traumatic brain injury, CVA, and vision problems did not interfere with his ability to perform basic work activities and were not severe. (R. at 20).

At step three, ALJ Gonzalez determined that none of the impairments, either alone or in combination, met or was equal in severity to the impairments enumerated in the Listings. (R. at 20).

At the fourth step, the ALJ determined that Mr. Nelson had the residual functional capacity to perform medium work as defined by the regulations. (R. at 22). He could perform simple, repetitive work, because he could understand, remember, and carry out simple routine instructions. (R. at 22). He could also make judgments commensurate with the functions of unskilled work, respond appropriately to supervision, respond to the public, deal with changes in a routine work setting, and reach with one extremity. (R. at 22). The ALJ noted that the plaintiff would have to avoid working at unprotected heights. (R. at 22).

The ALJ then concluded that Mr. Nelson could not perform his past relevant work but that there were a significant number of jobs in the national economy that he was capable of performing. (R. at 26). This was based on the Medical-Vocational Guidelines contained in the regulations (the "Grids"), see 20 C.F.R. Part

404, Subpt. P, App. 2, against which the ALJ compared his findings
that the plaintiff qualified as an individual of advanced age, had
at least a high school diploma, was able to communicate in English,
and had the residual functional capacity to perform medium work.
(R. at 26-27).   Thus, ALJ Gonzalez found Mr. Nelson not disabled
under the Act.   (R. at 27).

Discussion

The  plaintiff  advances  four  primary  contentions  for
overturning the Commissioner's decision.   First, he asserts that
the ALJ erred in assigning great weight to both Dr. Puri's and Dr.
Hoffman's opinions, that he erred in assigning only "some weight"
to the function report filled out by Mr. Nelson's sister, and that
he erred in assigning little weight to the opinions of Dr. Dubro
and  Dr.  Russo.    (Plaintiff's  Memorandum  of  Law  in  Support  of
Plaintiff's Motion for Judgment on the Administrative Record and
Pleadings Pursuant to Rule 12(c) F.R.C.P. ("Pl. Memo.") at 9-14).
Next,  he  contends  that  the  ALJ  erred  when  assessing  his
credibility.   (Pl. Memo. at 15-18).   Third, he argues that the
residual functional capacity assessment was flawed. (Pl. Memo. at
18-22).   Fourth, he argues that the ALJ's reliance on the Grids
was misplaced.  (Plaintiff's Reply Memorandum of Law in Opposition
to Defendant's Cross-Motion and in Further Support of Plaintiff's

Motion for Judgment on the Administrative Record and Pleadings Pursuant to Rule 12(c) F.R.C.P. at 4-5).

A.     Treating Physician

1.     Framework

Pursuant to the regulations, "the opinion of a claimant's treating physician as to the nature and severity of the impairment is given 'controlling weight' so long as it 'is well-supported by medically acceptable clinical and laboratory diagnostic techniques and is not inconsistent with the other substantial evidence in [the] case record.'"  Burgess v. Astrue, 537 F.3d 117, 128 (2d Cir. 2008) (alteration in original) (quoting 20 C.F.R. § 404.1527(c)(2)); see also Greek v. Colvin, 802 F.3d 370, 375 (2d Cir. 2015).  "This preference is generally justified because treating sources are likely to be 'the medical professionals most able to provide a detailed, longitudinal picture' of a plaintiff's medical impairments and offer a unique perspective that the medical tests and SSA consultants are unable to obtain or communicate." Correale-Engelhart v. Astrue, 687 F. Supp. 2d 396, 426 (S.D.N.Y. 2010) (quoting 20 C.F.R. § 416.927(c)(2)); see also Petrie v. Astrue, 412 F. App'x 401, 405 (2d Cir. 2011) (summary order) ("The opinion of a treating physician is accorded extra weight because the continuity of treatment he provides and the doctor/patient relationship he develops place him in a unique position to make a

complete and accurate diagnosis of his patient." (quoting Mongeur v. Heckler, 722 F.2d 1033, 1039 n.2 (2d Cir. 1983) (per curiam))). Generally, the treating physician's opinion is not entitled to controlling weight if it is not consistent with the opinions of other medical experts. Burgess, 537 F.3d at 128.

In considering a treating source's opinion, "the ALJ cannot arbitrarily substitute his own judgment for competent medical opinion." Rosa v. Callahan, 168 F.3d 72, 79 (2d Cir. 1999) (quoting McBrayer v. Secretary of Health and Human Services, 712 F.2d 795, 799 (2d Cir. 1983)); see also Wagner v. Secretary of Health and Human Services, 906 F.2d 856, 862 (2d Cir. 1990) (noting that "a circumstantial critique by non-physicians . . . must be overwhelmingly compelling in order to overcome a medical opinion"). However, determination of "dispositive" issues, such as whether the plaintiff "meet[s] the statutory definition of disability" and cannot work, are reserved for the Commissioner. 20 C.F.R. § 404.1527(d)(1); see Greek, 802 F.3d at 376.

If the ALJ determines that a treating physician's opinion is not controlling, he is nevertheless required to consider the following factors in determining the weight to be given to that opinion: (1) the length of the treatment relationship and the frequency of examination; (2) the nature and extent of the treatment relationship; (3) the evidence and explanation provided

to support the treating physician's opinion; (4) the consistency of the opinion with the record as a whole; (5) whether the opinion is from a specialist; and (6) other factors brought to the Commissioner's attention that tend to support or contradict the opinion.  20 C.F.R. § 404.1527(c); see Greek, 802 F.3d at 375; Halloran v. Barnhart, 362 F.3d 28, 32 (2d Cir. 2004).  Although the ALJ need not explicitly discuss the factors, the decision must clearly demonstrate that he properly applied the required analysis.  Khan v. Astrue, No. 11 CV 5118, 2013 WL 3938242, at *15 (E.D.N.Y. July 30, 2013).

"A corollary to the treating physician rule is the so-called 'good reasons rule,' which is based on the regulations specifying that 'the Commissioner "will always give good reasons"' for the weight given to a treating source opinion."  Silva v. Colvin, No. 14 CV 6329, 2015 WL 5306005, at *5 (W.D.N.Y. Sept. 10, 2015) (quoting Halloran, 362 F.3d at 32); see also Burgess, 537 F.3d at 129-30 (noting that ALJ must provide "good reasons" for discounting treating physician's opinion).  Failure to identify good reasons for discounting a treating physician's opinion "denotes a lack of substantial evidence, even where the conclusion of the ALJ may be justified based upon the record."  Silva, 2015 WL 5306005, at *5 (emphasis omitted) (quoting Blakely v. Commissioner of Social Security, 581 F.3d 399, 407 (6th Cir. 2009)).

2. <u>Analysis</u>

In finding that the plaintiff had the residual functional capacity to perform medium work, the ALJ assigned Dr. Russo's two medical source statements little weight. (R. at 22-23). Those statements opined that Mr. Nelson would have serious limitations, primarily that he could do no work with his right side, would require frequent breaks, had trouble concentrating, and would perform poorly in a work place environment. (R. at 319-29).

The ALJ first assigned little weight to the statements because they were "poorly supported by the treatment notes of record." (R. at 23). In the medical source statements, Dr. Russo states that Mr. Nelson's CVA in conjunction with his prior brain trauma would severely limit his ability to function in a workplace environment. (R. at 319-29). Dr. Russo states that the head trauma, CVA, and hypertension caused hemiplegia, decreased focus, dizziness, fatigue, pain, and inability to lift or carry. (R. at 319-29). However, Dr. Russo does not appear to have performed any objective, clinical test that would support a finding of severe limitation. Instead, the treatment notes reflect that Mr. Nelson appeared in no acute distress and had a normal mood, affect, attention span, reflexes, sensation, coordination, and muscle strength. (R. at 306, 317). There is simply no apparent objective basis for Dr. Russo's medical source opinions. Therefore, the ALJ

did not err when he found that there was little objective evidence to support Dr. Russo's conclusions.

The ALJ also assigned Dr. Russo's opinion little weight because it conflicted with Dr. Puri's evaluation. (R. at 23). Dr. Puri's found 5/5 muscle strength in all groups. (R. at 278-79). Dr. Puri performed objective medical tests to find that there were no "objective limitations in communication, fine motor, or gross motor activity." (R. at 277-79). The ALJ was therefore correct when finding that Dr. Puri's evaluation conflicted with Dr. Russo's.

Dr. Singh's medical notes also support this conclusion. Dr. Singh found good muscle strength, normal stride, normal reflexes, and normal sensation. (R. at 309). While Dr. Singh did find that Mr. Nelson had difficulty raising his right hand above his head and that Mr. Nelson had subjective right side paresthesia (R. at 309), these findings do not adequately support Dr. Russo's opinion. Therefore, the ALJ had a substantial basis for holding that Dr. Russo's opinion was not entitled to controlling weight.

The ALJ also considered the required six factors when determining the weight to assign to Dr. Russo's opinions. The ALJ discussed Mr. Nelson's three visits with Dr. Russo and considered what occurred at those visits. (R. at 23). The ALJ addressed the inconsistency of Dr. Russo's opinion with Dr. Russo's own treatment

notes; the ALJ further stated that Dr. Russo's opinion was not supported by Dr. Puri's physical examination of Mr. Nelson. (R. at 23). Finally, Dr. Russo practices family medicine, and thus does not appear to be a specialist in the relevant field, i.e., neurology. (R. at 329). It is evident that the ALJ performed the proper analysis pursuant to the regulations.

The ALJ noted that Dr. Russo failed to clarify his opinion when asked. (R. at 23); see Correale-Englehart, 687 F. Supp. 2d at 428 (stating that ALJ is required to seek clarification when medical source contains conflict, ambiguity, or gaps in information). Therefore, there is substantial evidence supporting the Commissioner's decision to assign Dr. Russo's opinion little weight.[7]

B. Consultative Examiners

The ALJ concluded that Dr. Dubro's opinion was entitled to little weight and that Dr. Puri's and Dr. Hoffman's opinions were each entitled to great weight. "It is well-settled that a consulting physician's opinion can constitute substantial evidence

---

[7] ALJ Gonzalez also assigned the source statements little weight because Mr. Nelson provided answers to the source statement questions, which Dr. Russo "appear[ed] to have uncritically accepted." (R. at 23). While it is clear that Dr. Russo asked Mr. Nelson questions from the form (R. 70-72), it is not clear that Dr. Russo merely "uncritically accepted" his answers. While the ALJ erred in this analysis, it does not undermine the substantial evidence supporting the ALJ's conclusion overall.

supporting an ALJ's conclusions." Suarez v. Colvin, 102 F. Supp. 3d 552, 577 (S.D.N.Y. 2015). The opinions may constitute substantial evidence only when they are supported by medical evidence in the record. Id.; Frawley v. Colvin, 13 CV 1567, 2014 WL 6810661, at *9 (N.D.N.Y. Dec. 2, 2014). Indeed, where the consultative examiner's opinion is more consistent with the medical evidence than the treating physician's opinion, then the consultative examiner's opinion may be given more weight. Suarez, 102 F. Supp. 3d at 577.

There is substantial evidence supporting the ALJ's finding that the opinions of both Dr. Puri and Dr. Hoffman were entitled to great weight. Both were consistent with Dr. Puri's own examination of the plaintiff and were supported by the objective, clinical tests that Dr. Puri performed. (R. at 277-79). The opinions are also consistent with Dr. Russo's medical treatment notes, finding that the plaintiff was alert, cooperative, in no acute distress, and had normal muscle strength, reflexes, and sensation. (R. at 306, 317, 364). The opinions were consistent with Dr. Singh's findings that the plaintiff walked with a normal gait and stride, demonstrated full strength in all muscle groups, and had normal muscle tone and sensation in all extremities. (R.

at 309). Therefore, the ALJ did not err when assigning Dr. Puri's and Dr. Hoffman's opinions great weight.[8]

The ALJ's determination that Dr. Dubro's opinion was entitled to little weight was not erroneous. Dr. Dubro found that the plaintiff's mental functioning would cause him great difficulty in a work environment. (R. at 275). While Dr. Dubro's opinion is supported by his own objective medical tests (R. at 272-75), it contradicts Dr. Russo's medical treatment notes, Dr. Singh's treatment notes, Dr. Puri's examination, and Dr. Hoffman's analysis of the evidence, none which suggest that the plaintiff would not be able to function adequately in a basic work environment (R. at 279, 282, 306, 309, 317, 364). Because Dr. Dubro's opinion conflicts with much of the other objective medical evidence in the record, the ALJ's determination to discount that opinion is supported by substantial evidence.

C.   Credibility Assessment

An ALJ's ruling on a claimant's residual functional capacity must "take the claimant's reports of pain and other limitations into account, but [he] is not required to accept the claimant's

---

[8] The ALJ found that the plaintiff's traumatic brain injury was a non-severe impairment; the plaintiff argues that because Dr. Puri found that the plaintiff had a traumatic brain injury, that the ALJ should have instead found that injury to be severe. However, there is no finding in Dr. Puri's examination notes supporting the plaintiff's contention. (R. at 277-79).

subjective complaints without question; he may exercise discretion in weighing the credibility of the claimant's testimony in light of the other evidence in the record." <u>Genier v. Astrue</u>, 606 F.3d 46, 49 (2d Cir. 2010) (internal citations omitted). A two-step process is employed when evaluating a claimant's assertions of pain and limitations. <u>Id.</u> First, "the ALJ must decide whether the claimant suffers from a medically determinable impairment that could reasonably be expected to produce the symptoms alleged. That requirement stems from the fact that subjective assertions of pain alone cannot ground a finding of disability." <u>Id.</u> (citation omitted). "If the claimant does suffer from such an impairment, at the second step, the ALJ must consider 'the extent to which [the claimant's] symptoms can reasonably be accepted as consistent with the objective medical evidence and other evidence' of record." <u>Id.</u> (alteration in original) (quoting 20 C.F.R. § 404.1529(a)). The ALJ must consider:

> [s]tatements [the claimant] or others make about [his] impairment(s), [his] restrictions, [his] daily activities, [his] efforts to work, or any other relevant statements [he] make[s] to medical sources during the course of examination or treatment, or to [the agency] during interviews, on applications, in letters, and in testimony in [its] administrative proceedings.

<u>Id.</u> (alterations in original) (quoting 20 C.F.R. § 404.1512(b)(3)).

"It is the function of the [Commissioner], not [the reviewing court], to resolve evidentiary conflicts and to appraise the credibility of witnesses, including the claimant." Valdez v. Colvin, __ F. Supp. 3d __, __, 2017 WL 474057, at *7 (S.D.N.Y. 2017) (alterations in original) (quoting Carroll v. Secretary of Health & Human Services, 705 F.2d 638, 642 (2d Cir. 1983)). An ALJ's credibility determination is generally entitled to deference, and where the ALJ's findings are supported by substantial evidence, the court must uphold that decision. Id.

There is substantial evidence supporting the ALJ's credibility determination. First, the ALJ gave appropriate weight to the plaintiff's collection of unemployment benefits (R. at 25), because "an ALJ may consider evidence that the claimant received unemployment benefits and/or certified that he was ready, willing, and able to work during the time period for which he claims disability benefits as adverse factors in the ALJ's credibility determination," Rosenthal v. Colvin, No. 12 CV 892, 2014 WL 1219072, at *3 (W.D.N.Y. March 24, 2014) (quoting Felix v. Astrue, No. 11 CV 2607, 2012 WL 3043203, at *10 (E.D.N.Y. July 24, 2012)). Second, while the record contained opinions from Drs. Russo and Dubro indicating disability, those opinions were appropriately accorded slight weight. (R. at 25). Third, the ALJ properly found that there was no objective medical examination finding that Mr.

Nelson could not use the right side of his body. (R. at 24).
Fourth, the ALJ noted that the plaintiff was able to perform some
daily activities, including walking, biking, swimming, and outdoor
chores. (R. at 25, 52-56). Fifth, ALJ Gonzalez correctly found
that the plaintiff provided conflicting statements about his
driving ability: he told Dr. Dubro that he could not drive (R. at
274), but reported elsewhere that he could drive, including at the
hearing (R. at 55, 216). Sixth, the ALJ properly noted that the
plaintiff's treating regimen was relatively "conservative in
nature" given the plaintiff's complaints. (R. at 25); see Penfield
v. Colvin, 563 F. App'x 839, 840 (2d Cir. 2014). Finally, the ALJ
gave appropriate weight to the plaintiff's "apparent lack of
debilitating symptoms during the hearing." (R. at 26); see Henny
v. Commissioner of Social Security, No. 15 Civ. 629, 2017 WL
1040486, at *16 (S.D.N.Y. March 15, 2017) (deference accorded to
ALJ's observations at hearing).

The plaintiff argues that the ALJ failed to consider his good
work history. However, the ALJ did not ignore the plaintiff's
work history (R. at 25), and, in any event, failure to specifically
reference good work history "does not undermine the credibility
assessment, given the substantial evidence supporting the ALJ's
determination." Wavercak v. Astrue, 420 F. App'x 91, 94 (2d Cir.

2011).  Therefore, there is substantial evidence supporting the ALJ's credibility finding.[9]

D.    <u>Third-Party Function Report</u>

The plaintiff also objects to the ALJ's assignment of only "some weight" to Ms. Nelson's third-party function report.  The ALJ discounted this report both because Ms. Nelson is a family member and because it is not supported by the objective medical record.  (R. at 24).  This analysis was not erroneous.

E.    <u>Residual Functional Capacity Determination</u>

The plaintiff argues that the residual functional capacity determination was flawed because there was no objective basis for finding that the plaintiff could perform medium work and because ALJ Gonzalez did not consider all of the plaintiff's impairments together.  The ALJ's residual functional capacity findings "must

---

[9] The ALJ also found the plaintiff not credible because "he drove approximately five hours" to Quebec five to ten times per year.  (R. at 25).  However, the plaintiff did not state that he drove himself to Quebec, only that he travelled there.  (R. at 35-36).

The ALJ also found that there was no evidence supporting the plaintiff's reporting of a stroke.  (R. at 24).  However, Dr. Russo indicates that Mr. Nelson had a "CVA/stroke" in his medical treatment notes (R. at 314); Dr. Dubro also opined that Mr. Nelson had "what appear[ed] to be a transient ischemic attack six months ago" (R. at 272).

While the ALJ erred on both these issues, these errors do not undermine the substantial evidence supporting the credibility finding.

include a narrative discussion describing how the evidence supports each conclusion, citing specific medical facts . . . and nonmedical evidence." SSR 96-8p, 1996 WL 374184, at *7 (July 2, 1996); see also Cichocki, 729 F.3d at 177 ("Remand may be appropriate [] where . . . inadequacies in the ALJ's residual functional capacity analysis frustrate meaningful review."); Glessing v. Commissioner of Social Security, No. 13 CV 1254, 2014 WL 1599944, at *8-9 (E.D.N.Y. April 21, 2014) ("The problem . . . is that, although the ALJ certainly made findings as to [the] claimant's limitations, the ALJ provided no analysis explaining upon what evidence those findings were based."); Jones v. Commissioner of Social Security, No. 12 Civ. 4815, 2013 WL 3486994, at *12 (S.D.N.Y. July 11, 2013). ALJ Gonzalez's residual functional capacity analysis was well reasoned; he relied on Dr. Puri's examination, Dr. Singh's treatment notes, Dr. Russo's medical treatment notes, and Dr. Hoffman's analysis to conclude that Mr. Nelson could perform medium work. (R. at 22-26). The ALJ considered Mr. Nelson's symptoms separately and in conjunction with one another. (R. at 22). Therefore, the residual functional capacity assessment was proper.

F. Reliance on the Grids

The plaintiff argues that the ALJ erred when relying on the Grids because of his alleged non-exertional impairments. If a

claimant suffers only from exertional impairments, then the ALJ can demonstrate that there is other work that the claimant can perform by resorting exclusively to the Grids. See Rosa, 168 F.3d at 78; Pratts v. Chater, 94 F.3d 34, 38-39 (2d Cir. 1996). However, where a claimant has both exertional and non-exertional impairments, the Grids may be used only as a framework for decision-making. 20 C.F.R. §§ 404.1569a(d). Nevertheless, if any non-exertional impairments do not significantly limit the range of work of which the claimant is otherwise capable, then reliance on the Grids is appropriate. See Zabala v. Astrue, 595 F.3d 402, 410-11 (2d Cir. 2010). Here, ALJ Gonzalez correctly found that "the additional limitations have little or no effect on the occupational base of unskilled medium work."[10] (R. at 27). Accordingly, his reliance on the Grids was not erroneous.

Conclusion

For the reasons discussed above, the plaintiff's motion for judgment on the pleadings (Docket no. 12) is denied and the defendant's cross-motion (Docket no. 15) is granted. The Clerk of

---

[10] Although Dr. Dubro diagnosed major depression and the plaintiff reported trouble getting out of bed in the morning and maintaining his hygiene (R. at 274-75), the ALJ had substantial evidence for discounting Dr. Dubro's opinion and the plaintiff's credibility. Moreover, Dr. Hoffman's report indicates that the plaintiff's non-exertional impairments "do not preclude work related function." (R. at 282).

Court is respectfully directed to enter judgment accordingly and close this case.

SO ORDERED.

JAMES C. FRANCIS IV
UNITED STATES MAGISTRATE JUDGE

Dated: New York, New York
April 14, 2017

Copies transmitted this date:

Gary J. Gogerty, Esq.
Drake, Loeb, Heller, Kennedy, Gogerty, Gaba & Rodd, PLLC
555 Hudson Valley Ave., Suite 100
New Windsor, NY 12553

Maria P.F. Santangelo, Esq.
Social Security Administration, Office of the General Counsel
26 Federal Plaza, Suite 3904
New York, NY 10278